

UNITED STATES DISTRICT COURT
FILED
APR 21 2025
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF NEW YORK**

Richard V. Petix,                                    25-mc-17

Plaintiff/Movant,

v.

The United States of America,

Defendant.

**MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g)**

**Introduction**

Defendant/Movant Richard Petix ("Movant"), proceeding pro se, respectfully moves this Court

under Federal Rule of Criminal Procedure 41(g) for an order directing the United States

("Government") to return 37 Bitcoin (BTC), or their equivalent value, transferred to a

government undercover agent (UCA) on December 3, 2015. The criminal proceedings against

Movant have concluded, rendering this motion a civil action seeking equitable relief. The

Second Circuit recognizes that Rule 41(g) provides an equitable remedy, especially when no

adequate legal remedy exists. See *Bertin v. United States*, 478 F.3d 489, 492 (2d Cir. 2007); *De

Almeida v. United States*, 459 F.3d 377, 382 (2d Cir. 2006). The Government's continued

retention of the 37 BTC is unlawful because:

(1) no valid final forfeiture order authorizes it;

(2) the property is not contraband;

(3) the property is not needed as evidence; and

1

(4) the retention violates Movant's Fourth and Fifth Amendment rights.

**PRELIMINARY STATEMENT**

The Government obtained possession of the 37 BTC on December 3, 2015, after Movant transferred these BTC to a government undercover agent (UCA) as part of an arranged interaction. Following Movant's arrest, the Government retained possession. Movant challenges this continued retention under Rule 41(g), as no valid forfeiture order supports it. Although a preliminary forfeiture affidavit mentioned the transaction, it explicitly excluded it from the proposed money judgment because the government itself received the funds (R. Doc. 73-1 at 11-12 n.5). The final judgment of conviction, pronounced orally at sentencing on November 1, 2017, did not include any monetary forfeiture, only the forfeiture of specific electronic equipment (R. Doc. 113 at 34; R. Doc. 101).

The procedural defects that invalidate any purported forfeiture are:

1. **Failure to Announce Forfeiture at Sentencing:** The District Court did not orally announce any monetary forfeiture at the sentencing hearing, as required by Fed. R. Crim. P. 32.2(b)(4)(B) (R. Doc. 113 at 34).

2. **Improper Written Orders:** Subsequent attempts by the Government to include monetary forfeiture in written orders (R. Doc. 102; R. Doc. 108) contradicted the oral pronouncement and were procedurally improper.

3. **Second Circuit Vacatur:** The Second Circuit vacated the monetary forfeiture, holding that the oral sentence controlled and that the District Court failed to comply with Rule 32.2(b)(4)(B) (R. Doc. 112).

Despite the conclusion of criminal proceedings and the vacatur of the monetary forfeiture, the Government retains the 37 BTC without legal justification. Preliminary blockchain analysis suggests possible misappropriation of these funds by the seizing agent, raising concerns about government misconduct and further undermining any claim to lawful possession [Exhibit A][1]. Movant seeks the return of his property under Rule 41(g) and requests equitable tolling of the statute of limitations for related civil claims, pending investigation into potential agent misconduct.

**Statement of Facts**

1. On December 3, 2015, Movant transferred approximately 37 BTC (valued around $13,000 at the time) to either special agent Glor or Nasca prior to his arrest (Exhibit B; R. Doc. 73-1 at 5). The PSR further corroborates the events of December 3, 2015, noting that officers observed an open Bitcoin wallet on Movant's laptop displaying a transaction for 37 bitcoins, valued at the time at approximately $13,320 (R. Doc. 72 ¶¶ 24, 51-53).

---

[1] Exhibit A shows a preliminary investigation on the movement of the bitcoin after it was seized to what appears to be a Coinbase address. The breaking into smaller increments at the Coinbase address suggest it is being converted into fiat currency. 19 C.F.R. § 162.21(a) states "A receipt for seized property shall be given at the time of seizure to the person from whom the property is seized". Albeit the seizure of the plaintiff's bitcoin is well documented throughout the case, and all other seized property was accounted for with a receipt (Dkt. 73-1 pg. 13 Dated 12/03/2015) signed by both US Probation and Homeland Security Special Agent Ryan Glor, the bitcoin was not listed, and no receipt was provided to the defendant for the bitcoin. This raises due process concerns.

2. Movant pled guilty to violating 18 U.S.C. § 1960 and 18 U.S.C. § 1001 (R. Doc. 69; R. Doc. 104).

3. The Government sought criminal forfeiture, initially calculating a money judgment of $189,862.96 (R. Doc. 73-1). This figure was adopted in the Presentence Investigation Report ("PSR"), which calculated the total value of funds for the unlicensed money transmitting business charge based on specific bank deposits and cash transactions occurring between August 2014 and December 3, 2015, totaling approximately $189,862.96 (R. Doc. 72 ¶¶ 37, 41, 53).

4. Crucially, the Government agent's affidavit explicitly excluded the 37 BTC/$13,000 UCA transaction from this calculation, stating, "...because HSI received that transfer." (R. Doc. 73-1 at 11-12 n.5). Notably, the PSR's calculation also did not include the separate 37 BTC transaction with the undercover agent.

5. A Preliminary Order of Forfeiture included the $189,862.96 but was based on the calculation excluding the 37 BTC (R. Doc. 75 at 2).

6. The PSR states the plaintiff's relevant conduct involved approximately $189,862.96 (R. Doc. 72 ¶ 53), again excluding the value of the 37 bitcoins transferred to the UCA.

7. The PSR also acknowledged the seizure of Bitcoin distinct from the amount used in the loss calculation, stating, 'It should be noted the defendant had Bitcoin(s) confiscated by agents when he was arrested for the instant offense. Said Bitcoin has value, however, the exact value is unknown by this officer, as of this writing' (R. Doc. 72 ¶ 110). This

confirms the PSR distinguished between the funds included in the relevant conduct calculation and the Bitcoin confiscated during the arrest involving the UCA.

8. At the November 1, 2017 sentencing, the Court orally ordered only the forfeiture of electronic equipment, making no mention of any monetary forfeiture (R. Doc. 113 at 34; R. Doc. 101).

9. A Final Order of Forfeiture (Nov. 3, 2017, R. Doc. 102) and later an Amended Judgment (Jan. 17, 2018, R. Doc. 108) improperly added the $189,862.96 monetary forfeiture, contradicting the oral pronouncement.

10. On appeal, the Second Circuit vacated the monetary forfeiture portion of the judgment, confirming the oral sentence controlled and the failure to announce monetary forfeiture at sentencing violated Fed. R. Crim. P. 32.2(b)(4)(B) (R. Doc. 112).

11. The 37 BTC have not been returned. Preliminary blockchain analysis suggests potential agent misappropriation [Exhibit A].

**Legal Argument**

**II. No Valid Forfeiture Order Exists for the 37 Bitcoins**

The Government cannot justify retaining the 37 BTC via criminal forfeiture because no valid, final order forfeiting *this specific property* exists.

- **Monetary Forfeiture Vacated:** The Second Circuit definitively nullified the $189,862.96 monetary forfeiture judgment due to the District Court's violation of the mandatory notice requirements of Fed. R. Crim. P. 32.2(b)(4)(B) (R. Doc. 112). This vacated amount

was derived directly from calculations, adopted in the PSR, that accounted for various transactions *but excluded* the specific 37 BTC transferred to the government agent (R. Doc. 72 ¶ 53). The Rule requires the court to "include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing". Failure to comply renders the forfeiture invalid. *See McIntosh v. United States*, 601 U.S. 330 (2024) (discussing Rule 32.2 timing requirements); *Alli-Balogun v. United States*, 281 F.3d 362, 369 (2d Cir. 2002) (holding that failure to provide adequate notice of forfeiture at sentencing, as required by the rules, constitutes a fundamental procedural error that renders the forfeiture order void). The Second Circuit explicitly applied this principle in Movant's own appeal, vacating the monetary forfeiture precisely because this mandatory notice was absent (R. Doc. 112).

- **Controlling Oral Sentence:** The only valid forfeiture was for the electronic equipment, as announced orally (R. Doc. 113 at 34). The 37 BTC were not mentioned.

- **No Specific Forfeiture:** The Government sought a general money judgment, not forfeiture of these specific 37 BTC. Federal Rule of Criminal Procedure 32.2(b)(2)(A) requires a preliminary order to direct forfeiture of "specific property," which never occurred for these Bitcoins.

- **Sentencing Context:** The Judge stated he was declining to add the enhancement under U.S.S.G. § 2S1.3(b)(1) that the defendant knew or believed the funds were proceeds of unlawful activity, removed all arm's length transactions from relevant conduct, and stated that he was bound to the definition of a money transmitting business under

6

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999) (R. Doc. 113 at 4–9). This context further underscores that the focus was not on forfeiting every transaction, particularly the one excluded by the government itself.

### III. The Government Cannot Otherwise Justify Retaining the Property

Absent a valid forfeiture order, retention is unlawful.

- **Not Contraband:** Bitcoin itself is property, not per se contraband.

- **Not Needed as Evidence:** The criminal case is concluded. *See Farrell v. United States*, 606 F.2d 1341, 1347 (D.C. Cir. 1979).

- **Government Admission of Exclusion:** The Government's documented decision to exclude the 37 BTC/$13,000 from its forfeiture calculation because the Government itself received the transfer is a critical admission (R. Doc. 73-1 at 11-12 n.5). This is further supported by the PSR, which adopted the Government's $189,862.96 figure based on other transactions (R. Doc. 72 ¶ 53) and separately acknowledged confiscated Bitcoin of unknown value (R. Doc. 72 ¶ 110), demonstrating these specific 37 Bitcoins were consistently treated as separate from the amount sought in the (now vacated) money judgment. Retaining them after the intended forfeiture judgment was vacated is unreasonable.

- **Nature of Transaction:** This specific transfer of 37 BTC was made directly *to* a government undercover agent as part of an arranged interaction, not to facilitate a payment for an unrelated third party. While Movant pleaded guilty to operating an

unlicensed money transmitting business under 18 U.S.C. § 1960, the government's

justification for retaining *these specific funds* is particularly weak. Firstly, the government

itself explicitly excluded this transaction from its forfeiture calculations precisely *because*

its own agent received the transfer (R. Doc. 73-1 at 11-12 n.5). Secondly, the nature of

the transaction arguably aligns more closely with a direct exchange or sale, potentially

akin to a "user" acting on their own behalf as contemplated in FinCEN guidance

(distinguishing users investing/trading for their own account from transmitters acting for

others), rather than the third-party facilitation central to the *United States v. Velastegui*,

199 F.3d 590 (2d Cir. 1999) definition of money transmitting (Exhibit C; FIN-2014-R002).

Regardless of whether the transaction itself constituted part of the offense conduct, the

government's decision to exclude it from forfeiture calculations, combined with the

subsequent vacatur of the *only* monetary forfeiture judgment sought, eliminates any

legal basis for retaining these specific 37 BTC.

## IV. Continued Retention Violates Movant's Constitutional Rights

- **Fourth Amendment:** The ongoing deprivation without a valid order constitutes an

  unreasonable seizure. While circuits are split, the D.C. and Ninth Circuits hold that the

  Fourth Amendment's reasonableness requirement applies to the entire duration of

  property retention, not just the initial seizure. See *Asinor v. District of Columbia*, --- F.4th

  ----, 2024 WL 3733171 (D.C. Cir. Aug. 9, 2024); *Brewster v. Beck*, 859 F.3d 1194 (9th Cir.

  2017). The Second Circuit in *United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014) (vacated

  on reh'g en banc on other grounds, 824 F.3d 199 (2d Cir. 2016)), found that retaining

digital files beyond the scope of a warrant for years violated the Fourth Amendment, suggesting retention itself can be unreasonable. Here, retention serves no valid purpose post-conviction and post-vacatur of forfeiture. See also *United States v. Premises Known as 25 Coligni Ave.*, 120 F.R.D. 465 (S.D.N.Y. 1988).

- **Fifth Amendment:** Depriving Movant of his property based on a procedurally defective and ultimately vacated forfeiture process violates the Fifth Amendment's Due Process Clause. The right to property cannot be extinguished without fundamentally fair procedures. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (emphasizing the importance of pre-deprivation notice and hearing in civil forfeiture, reflecting core due process concerns). The failure to provide the mandatory notice of forfeiture at sentencing under Rule 32.2(b)(4)(B), leading the Second Circuit to vacate the forfeiture judgment in Movant's case, represents precisely such a critical failure of due process. As established in *Alli-Balogun*, forfeiture imposed without adherence to mandatory procedural safeguards, particularly notice requirements that ensure the defendant understands the consequences of the sentence, is fundamentally unfair and therefore void. See *Alli-Balogun*, 281 F.3d at 369.

- **Forfeiture Requirements:** To forfeit property through criminal forfeiture, the government must comply with statutory requirements, including proving a nexus to the crime, providing notice in the indictment, and describing the property with particularity. Constitutionally, the government must ensure due process and avoid excessive fines. The government is required to list the specific property it seeks to forfeit in the notice to the

defendant, as this is essential for the defendant to mount a defense. Cases such as *United States v. James Daniel Good Real Property* and *United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993), underscore these principles. The government failed to meet these requirements regarding the 37 BTC.

## V. Equitable Relief is Warranted

This Court possesses equitable jurisdiction under Rule 41(g) to order the return of property when criminal proceedings have concluded. The Second Circuit consistently recognizes Rule 41(g) as providing an equitable remedy, particularly where, as here, legal remedies like damages may be inadequate or unavailable. *See Bertin v. United States*, 478 F.3d 489, 492-93 (2d Cir. 2007) (confirming Rule 41(g)'s equitable nature and its availability even when a related damages claim might be time-barred); *Soviero v. United States*, 967 F.2d 791, 792-93 (2d Cir. 1992) (holding that a Rule 41 motion survives the conclusion of criminal proceedings and functions as a civil complaint for return of property, invoking the court's equitable powers). The equities strongly favor Movant: the Government's retention rests solely on a vacated judgment stemming from its own procedural errors; Movant maintains a clear possessory interest in the non-contraband property; the continued deprivation causes significant financial hardship; and Rule 41(g), as interpreted in *Bertin* and *Soviero*, provides the precise mechanism for relief. Balancing the equities—including the government's lack of legal justification and the potential agent misconduct discussed below—mandates the return of the property. If the specific Bitcoins are no longer available, equity demands the return of their equivalent value, as recognized in *Soviero*, 967 F.2d at 793.

10

## VI. Potential Agent Misconduct Further Mandates Return and Warrants Equitable Tolling

The preliminary blockchain analysis suggesting potential agent theft raises grave concerns about government misconduct. Furthermore, the preliminary blockchain analysis presented in Exhibit A raises serious concerns regarding the handling and disposition of the 37 Bitcoins after they were transferred to the government agent. The analysis indicates that the Bitcoins initially sent to the agent's wallet (1GZH...) on December 4, 2015, were subsequently moved. Specifically, the visualization shows the funds being transferred first to a different wallet (1P3...) and then further transferred to an account associated with Coinbase (1Jtc... & 1Nu4... respectively), a commercial cryptocurrency exchange.

This movement of funds out of what should have been a secure evidence wallet and onto a commercial platform like Coinbase suggests the Bitcoins may not have been merely secured as evidence. Instead, it raises the possibility that the agent(s) subsequently accessed, transferred, or potentially converted the Bitcoins into fiat currency for personal use or other unauthorized purposes, thereby misappropriating the property. This apparent deviation from standard evidence handling protocols strongly supports the need for further investigation, discovery, and an evidentiary hearing to determine the exact disposition of the 37 Bitcoins and address the potential agent misconduct.

If the seizing agent(s) misappropriated the 37 Bitcoin, the government's retention is not merely lacking legal basis due to the vacated forfeiture, but is tainted by illegality and potentially constitutes a "callous disregard" for the Defendant's constitutional rights under the Fourth and Fifth Amendments. *See Ramsden v. United States*, 2 F.3d 322, 325 (9th Cir. 1993) (listing callous

11

disregard as a factor for equitable jurisdiction); *United States v. Premises Known as 25 Coligni Ave.*, 120 F.R.D. 465, 468 (S.D.N.Y. 1988) (Rule 41 motions implicate constitutional rights). Such conduct, if proven, strongly weighs in favor of granting equitable relief under Rule 41(g). The defendant's description of the agents' coercive actions during his arrest (Exhibit D – Sworn affidavit from the plaintiff about the events that took place the night of his arrest) further supports the need for scrutiny of the agents' conduct. *See United States v. Albinson*, 356 F.3d 278 (3d Cir. 2004) (discussing potential *Bivens* claims for improper disposal of property). Furthermore, the potential theft necessitates equitable tolling of the statute of limitations for any related civil claims Defendant might pursue, such as under the Tucker Act, 28 U.S.C. § 1491 (for claims against the U.S. founded upon the Constitution, including takings), or *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). A *Bivens* action allows for damages against individual federal officers for constitutional violations, such as violations of the Fourth Amendment (unreasonable seizure/retention) or Fifth Amendment (deprivation of property without due process). The statute of limitations for such actions (often borrowed from state personal injury statutes, or the general six-year federal statute under 28 U.S.C. § 2401(a) for Tucker Act claims or Rule 41(g) itself, *see Ford-Bey v. United States*, No. 19-cv-2039 (BAH), 2020 WL 1904830, at *6 (D.D.C. Apr. 17, 2020); *Bertin*, 478 F.3d at 493) should not begin to run, or should be tolled, until the facts supporting the claim, specifically the alleged theft by the agent, are known or reasonably discoverable by the Defendant. *See Frith v. United States*, 268 F.R.D. 177, 180 (S.D.N.Y. 2010) (acknowledging possibility of equitable tolling). Concealment of the theft by the government or its agent would provide strong grounds for tolling. An investigation is required to uncover the facts regarding the disposition of the Bitcoin.

**Conclusion**

The 37 Bitcoins were never validly forfeited. The monetary judgment was vacated. The Government explicitly excluded these Bitcoins from forfeiture calculations and cannot otherwise justify retention. Continued retention violates Movant's Fourth and Fifth Amendment rights and equity demands return.

**Relief Requested**

WHEREFORE, Movant Richard Petix respectfully requests that this Court enter an Order:

1. Directing the United States Government to return the 37 Bitcoins transferred on December 3, 2015, to Movant forthwith; OR

2. Alternatively, if the 37 Bitcoins are unavailable, directing the United States Government to return their equivalent monetary value to Movant;

3. Declaring that the statute of limitations for any related civil claims (e.g., *Bivens*, Tucker Act) arising from the potential agent theft is equitably tolled until the facts concerning the disposition and alleged theft are fully disclosed or reasonably discoverable;

4. Granting an evidentiary hearing to resolve factual disputes regarding the Government's possession, disposition, value of the property, and the allegations of agent misconduct; and

5. Granting such other and further relief as this Court deems just and proper.

**AMENDED COMPLAINT**

Dated: April 17, 2025

Respectfully submitted,

/s/ Richard Petix

Richard Petix, Pro Se

73 Virginia Manor Rd.

Rochester, NY 14606

**Certificate of Service**

I hereby certify that on this 13th day of April, 2025, a true and correct copy of the foregoing Motion for Return of Property Pursuant to Fed. R. Crim. P. 41(g) was served upon the United States Attorney's Office for the Western District of New York via First Class Mail, postage prepaid, addressed to:

United States Attorney's Office

Western District of New York

138 Delaware Avenue

Buffalo, NY 14202

/s/ Richard Petix

Richard Petix

```
PJL DRIVERSTATUS DEVICE=OFF
@PJL EOJ
```

# exhibit A



# EXHIBIT A-1

## Crystalintelligence.com

**Crystal's identification of an entity as the owner of certain cryptocurrency addresses or clusters within its visualization tool relies on a multi-faceted approach:**

**Clustering:**

- Crystal groups together addresses that are likely controlled by the same entity. This is done by analyzing on- chain transaction patterns. For example, if multiple addresses are frequently used together as inputs or outputs in transactions, they are grouped together.

**Data Collection:**

- Crystal gathers data from various sources to identify the owners of these address clusters. Sources include:
- Publicly available information: This may include exchange websites, forums, social media, and other publicly available sources where cryptocurrency addresses and their owners might be mentioned.
- Known entity labels: Crystal maintains a database of known entities (like exchanges, businesses, etc.) and the addresses associated with them.
- Proprietary algorithms and analysis: They likely use proprietary techniques to correlate on-chain activity with off-chain information to make connections between addresses and entities.

**Labeling & Attribution:**

- Once a cluster of addresses is linked to a known entity, that entity's name (e.g., Coinbase) is assigned to the cluster within the Crystal visualization. This label then helps users understand the potential owner of those addresses.

**Important to Note:**

- User suggestions: Crystal may also allow users to suggest address ownership or report potential abuse, which the platform will then verify. In essence, Crystal's visualization tool seeks to connect the often- pseudonymous world of blockchain transactions with real-world entities, allowing users to see, for instance, which transactions or addresses are potentially related to the Coinbase exchange.

# EXHIBIT B

25-mc-17

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE | PAGE   6 |
|---|---|
| | CASE NUMBER BU02UR16BU0013 |
| R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | REPORT NUMBER: 001 |

The UCA asked if PETIX would mind waiting for a confirmation on the Bitcoin transfer. PETIX agreed and said whatever made the UCA comfortable since it was a larger transaction.

PETIX asked what the price was, it was approximately $355.20 and PETIX stated that he normally sells at market rate which made the Bitcoin amount owed for the $13,000.00USD approximately 36.599 bitcoins. The UCA provided an address for PETIX to send the Bitcoin to. PETIX input the address information into his laptop.

PETIX stated that, "You gave me your wallet, it's in my phone." PETIX proceeded to pull a smartphone out of his pocket and place it on the table.

PETIX asked the UCA to see the money. The UCA showed PETIX an envelope containing the $13,000USD and then returned the envelope to his/her pocket.

PETIX agreed to transfer 37 bitcoins total to the UCA with the understanding that some of the Bitcoin would go to the CD for arranging the meeting.

PETIX showed the UCA the screen on his laptop computer. PETIX explained the screen, the amount being sent and the change address that would be returned to him. The UCA was able to see the system appeared to be a Linux system and had TOR installed.

PETIX stated that he had purchased the laptop at a Best Buy in Rochester.

PETIX initiated the transfer to the UCA and the UCA was able to see the 37 Bitcoin transaction pending.

The UCA asked PETIX if it was alright in the future to get his phone number from the CD. PETIX stated that would be alright.

Three individuals approached the table and stated they were with probation and identified PETIX by his first name "Richard." The UCA and the CD were asked to step outside and talk to two of the probation officers.  One officer remained inside with PETIX. The UCA and CD exited the Tim Hortons location at 2149 hours.

The UCA sent the following SMS messages to PETIX after the meeting:

UCA (2202H): "Dude. What the fuck was that"

UCA (2304H): "Dude, I vouched for you. Whats going on, they took (UCA's name) phone and money."

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

**EXHIBIT C**

**FIN-2014-R002**

**Issued:**   **January 30, 2014**

**Subject:**   **Application of FinCEN's Regulations to Virtual Currency**
**Software Development and Certain Investment Activity**

---

Dear [ ]:

This responds to your letters of May 21, 2013 and July 10, 2013, seeking an administrative ruling from the Financial Crimes Enforcement Network ("FinCEN") regarding the status of [ ] (the "Company") as a money services business ("MSB") under the Bank Secrecy Act ("BSA"). Specifically, you ask whether the periodic investment of the Company in convertible virtual currency, and the production and distribution of software to facilitate the Company's purchase of virtual currency for purposes of its own investment, would make the Company a money transmitter under the BSA.

In your May 21, 2013 letter, you state that the Company intends to produce a piece of software that will facilitate the Company's purchase of virtual currency from sellers, by automating the collection of the virtual currency and the payment of the equivalent in currency of legal tender. The seller would initiate the process via the software's interface, offering its virtual currency to the Company, choosing among several options for a means of receiving the equivalent in currency of legal tender (check, credit to a designated credit, debit, or prepaid card, or payment processed through a third-party money transmitter), and paying a transaction fee. The software would not be sold or provided to any third party for resale, and it would be reserved for the sole use of the Company's counterparties.

Your addendum of July 10, 2013 clarifies that the Company intends to limit its activities to investing in convertible virtual currencies for its own account, purchasing virtual currency from sellers and reselling the currency at the Company's discretion, whenever such purchases and sales make investment sense according to the Company's business plan. The seller would offer its virtual currency to the Company via the software discussed above, and the Company would sell all or part of its virtual currency at a virtual currency exchange after receipt from the seller, at a time of the Company's choosing based on the Company's own investment decisions.

## BSA Obligations of the Company as a Software Provider

On July 21, 2011, FinCEN published a Final Rule amending definitions and other regulations relating to MSBs (the "Rule").[1] The amended regulations define an MSB as "a person wherever located doing business, whether or not on a regular basis or as an organized business concern, wholly or in substantial part within the United States, in one or more of the capacities listed in paragraphs (ff)(1) through (ff)(6) of this section. This includes but is not limited to maintenance of any agent, agency, branch, or office within the United States."[2]

BSA regulations, as amended, define the term "money transmitter" to include a person that provides money transmission services, or any other person engaged in the transfer of funds. The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.[3] The regulations also stipulate that whether a person is a money transmitter is a matter of facts and circumstances, and identifies circumstances under which a person's activities would not make such person a money transmitter.[4]

The production and distribution of software, in and of itself, does not constitute acceptance and transmission of value, even if the purpose of the software is to facilitate the sale of virtual currency. As a result, the Company's production and distribution of its contemplated software would not make the Company a money transmitter subject to BSA regulation.[5]

## BSA Obligations of the Company as an Investor in Virtual Currencies

On March 18, 2013, FinCEN issued guidance on the application of FinCEN's regulations to transactions in virtual currencies (the "guidance").[6] FinCEN's regulations define currency (also referred to as "real" currency) as "the coin and paper money of the United States or of any other country that [i] is designated as legal tender and that [ii] circulates and [iii] is customarily used and accepted as a medium of exchange in the country of issuance."[7] In contrast to real currency, "virtual" currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency. In particular, virtual currency does not have legal tender status in any jurisdiction.

---

[1] Bank Secrecy Act Regulations – Definitions and Other Regulations Relating to Money Services Businesses, 76 FR 43585 (July 21, 2011).

[2] 31 CFR § 1010.100(ff).

[3] 31 CFR § 1010.100(ff)(5)(i)(A) and (B).

[4] 31 CFR § 1010.100(ff)(5)(ii).

[5] A number of older FinCEN administrative rulings, although not directly on point because they interpret an older version of the regulatory definition of MSBs, explain the application of our definitions in comparable situations. *See, e.g.,* FIN-2009-R001, "Whether Certain Operations of a Service Provider to Prepaid Stored Value Program Participants is a Money Services Business," January 22, 2009, available at http://www.fincen.gov/statutes_regs/guidance/pdf/fin-2009-r001.pdf.

[6] FIN-2013-G001, "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies," March 18, 2013.

[7] 31 CFR § 1010.100(m).

The guidance addresses "convertible" virtual currency. This type of virtual currency either has an equivalent value in real currency, or acts as a substitute for real currency.

For purposes of the guidance, FinCEN refers to the participants in generic virtual currency arrangements, using the terms "exchanger," "administrator," and "user." An *exchanger* is a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency. An *administrator* is a person engaged as a business in issuing (putting into circulation) a virtual currency, and who has the authority to redeem (to withdraw from circulation) such virtual currency. A *user* is a person that obtains virtual currency to purchase goods or services on the user's own behalf.

The guidance makes clear that an administrator or exchanger of convertible virtual currencies that (1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency in exchange for currency of legal tender or another convertible virtual currency for any reason (including when intermediating between a user and a seller of goods or services the user is purchasing on the user's behalf) is a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person.[8] The guidance also makes clear that "a user who obtains convertible virtual currency and uses it to purchase real or virtual goods or services is **not** an MSB under FinCEN's regulations."

How a user engages in obtaining a virtual currency may be described using any number of other terms, such as "earning," "harvesting," "mining," "creating," "auto-generating," "manufacturing," or "purchasing," depending on the details of the specific virtual currency model involved. The label applied to a particular process of obtaining a virtual currency is not material to the legal characterization under the BSA of the process or of the person engaging in the process to send that virtual currency or its equivalent value to any other person or place. What is material to the conclusion that a person is not an MSB is not the mechanism by which person obtains the convertible virtual currency, but what the person uses the convertible virtual currency for, and for whose benefit. Activities that, in and of themselves, do not constitute accepting and transmitting currency, funds or the value of funds do not fit within the definition of "money transmission services" and therefore are not subject to FinCEN's registration, reporting, and recordkeeping regulations for MSBs.[9]

---

[8] The definition of "money transmitter" in FinCEN's regulations defines six sets of circumstances – variously referred to as limitations or exemptions – under which a person is not a money transmitter, despite accepting and transmitting currency, funds, or value that substitute for currency. 31 CFR § 1010.100(ff)(5)(ii)(A)-(F).

[9] However, a user wishing to purchase goods or services with a convertible virtual currency it has obtained, which pays the convertible virtual currency to a third party at the direction of a seller or creditor, may be engaged in money transmission. A number of older FinCEN administrative rulings, although not directly on point because they interpret an older version of the regulatory definition of MSBs, discuss situations involving persons that would have been exempted from MSB status, but for their payments to third parties not involved in the original transaction. *See* FIN-2008-R004 (Whether a Foreign Exchange Consultant is a Currency Dealer or Exchanger or Money Transmitter - 05/09/2008); FIN-2008-R003 (Whether a Person That is Engaged in the Business of Foreign Exchange Risk Management is a Currency Dealer or Exchanger or Money Transmitter - 05/09/2008); FIN-2008-R002 (Whether a Foreign Exchange Dealer is a Currency Dealer or Exchanger or Money Transmitter - 05/09/2008).

To the extent that the Company purchases and sells convertible virtual currency, paying and receiving the equivalent value in currency of legal tender to and from counterparties, all exclusively as investments for its own account, it is not engaged in the business of exchanging convertible virtual currency for currency of legal tender for other persons. In effect, when the Company invests in a convertible virtual currency for its own account, and when it realizes the value of its investment, it is acting as a user of that convertible virtual currency within the meaning of the guidance. As a result, to the extent that the Company limits its activities strictly to investing in virtual currency for its own account, it is not acting as a money transmitter and is not an MSB under FinCEN's regulations. However, any transfers to third parties at the behest of the Company's counterparties, creditors, or owners entitled to direct payments should be closely scrutinized, as they may constitute money transmission. (See footnote 10 to this ruling.)

If the Company were to provide services to others (including investment-related or brokerage services) that involved the accepting and transmitting of convertible virtual currency, or the exchange of convertible virtual currency for currency of legal tender or another convertible virtual currency, of course, additional analysis would be necessary to determine the Company's regulatory status and obligations with respect to such activity.[10] In addition, should the Company begin to engage as a business in the exchange of virtual currency against currency of legal tender (or even against other convertible virtual currency), the Company would become a money transmitter under FinCEN's regulations. Under such circumstances, the Company would have to register with FinCEN, implement an effective, risk-based anti-money laundering program, and comply with the recordkeeping, reporting, and transaction monitoring requirements applicable to money transmitters.

This ruling is provided in accordance with the procedures set forth at 31 CFR Part1010 Subpart G.[11] In arriving at the conclusions in this administrative ruling, we have relied upon the accuracy and completeness of the representations you made in your communications with us. Nothing precludes FinCEN from arriving at a different conclusion or from taking other action should circumstances change or should any of the information you have provided prove inaccurate or incomplete. We reserve the right, after redacting your name and address, and similar identifying information for your clients, to publish this letter

---

[10] For example, providing specific brokerage-related services might require the Company to be registered with the Securities and Exchange Commission (SEC) or the Commodities and Futures Trading Commission (CFTC), in which case the Company would be covered under the BSA as a securities broker-dealer or a commodities or futures trader. If the Company did not fall under SEC or CFTC supervision, then the extent to which its money transmission activities were integral to the non-money transmission services it provided would need to be considered in order to determine whether the Company could claim an exemption from the money transmitter definition under 31 CFR § 1010.100(ff)(5)(ii)(F), or would qualify as a money transmitter under FinCEN's regulations.

[11] Your subsequent e-mail communication of September 24, 2013 has informed us that you received a subpoena from the New York State Department of Financial Services on August 9, 2013 regarding the Company's activities. Although you have not informed us, and we have not by other means become aware, of the substance of any investigation to which this subpoena may relate, we have waived the requirement in our regulations that you certify that the question at issue in this administrative ruling is not applicable to any ongoing investigation. *See* 31 CFR §§ 1010.711(a)(4).

**EXHIBIT D**                                                          25-mc-17

**AFFIDAVIT OF Richard Vincent Petix**

I, Richard Vincent Petix, being first duly sworn, depose and state as follows:

1. I am over the age of eighteen (18) years and am competent to make this affidavit. The facts stated herein are based on my personal knowledge.
2. On the night of December 03rd 2015 after I denied ownership to us probation of the cell phone, the 3 HSI agents asked me to take a walk with them.
3. I asked where, and they told me the parking lot.
4. They escorted me to a black SUV, and told me to get in. When I told them no they told me if I knew what was good for me I would.
5. When I was put in the back, the big one grabbed my wrist while the other agent held out the cell phone confiscated from the table I was sitting at inside the Tim Hortons, pried my thumb out and dragged it against the fingerprint scanner.
6. When it didn't open, one time was not good enough so they did it a total of 3 times.
7. They continued to ask me over and over again if the property was mine.
8. I tried not to answer at first, and After about 20 minutes of being badgered I asked if I was under arrest.
9. They told me I was not. That's when I began to open the door and turn my back to exit the vehicle.
10. Thats when the biggest agent put me in an arm bar that not only scared me, but I could here that stretching sound of my arm about to break.
11. After I finally recovered I told him you can't do this to me and he told me "We're the federal government, and we can do whatever the fuck we want.".
12. They then asked me if I was sure I didn't have anything to say.
13. Even though I was not only scared but also in disbelief, that's when they told me I was under arrest and read me my Miranda rights.

FURTHER AFFIANT SAITH NAUGHT.

Richard Vincent Petix, Affiant        R. Pix

Sworn to and subscribed this 17th day of April , 2025.

Richard Petix

73 Virginia Manor Rd.

Rochester, NY 14606


April 17, 2025


Clerk of Court

United States District Court

Western District of New York

2 Niagara Square

 Buffalo, New York 14202-3498


**Re: Richard Petix v. United States of America, Case No. 25-mc-17**


**NOTICE OF FILING FIRST AMENDED COMPLAINT**


Dear Clerk of Court,


Please find enclosed:


* The Consent form in accordance with the provisions of 28 U.S.C. § 636(c)

* My First Amended Complaint in the above-referenced matter. I filed my original Complaint on April 14, 2025. I am now filing this First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1) as a matter of course, as no responsive pleading has yet been served.

The purpose of this amendment is to include exhibits that were inadvertently omitted from the original filing. These exhibits are attached hereto and referenced within the Amended Complaint.

The following exhibits are now included:

* Exhibit A: Blockchain Analysis (including diagram explanation)

* Exhibit B: DHS Report of Investigation No. 001, Page 6

 * Exhibit C: Department of Treasury Financial Crimes Enforcement Network: FIN-2014-R002

* Exhibit D: Signed and sworn affidavit of Richard Petix

This Amended Complaint supersedes the original Complaint in its entirety.

 Thank you for your attention to this matter.

Sincerely,

[Signature]

Richard Petix

Plaintiff, Pro Se



This package is made from post-consumer waste. Please recycle – again.



# UNITED STATES POSTAL SERVICE ®  |  PRIORITY MAIL ®

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.

**See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

# FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

# TRACKED ■ INSURED

PS00001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup, scan the QR code.



USPS.COM/PICKUP


howtorecycle.info
PAPER POUCH

Label 228, December 2023



05mc17


9589 0710 5270 0354 1623 21
POUCH

FSC MIX FSC® C116916


CERTIFIED MAIL ®

RDC 03


UNITED STATES POSTAL SERVICE

14202


UNITED STATES POSTAL SERVI

FROM: Richard
73 Virginia
Rochester, Ny

USDC- WDNY

APR 21 2025
BUFFALO 10

"Robert
United S
" Clerk o
2 Niagra
Buffalo, N

ROCHESTER, NY 14692

APR 18, 2025

$14.95

S2323A502534-6

14202

RDC 03

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments.
Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023. All rights reserved.

**PRIORITY MAIL**

**UNITED STATES POSTAL SERVICE®**

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM: Richard Petix
73 Virginia Manor Rd
Rochester Ny 14606

USDC-WDNY
APR 21 2025
BUFFALO

Robert H Jackson
United States Court House
" Clerk of Courts
2 Niagra Square
Buffalo, Ny 14202

FOR DOMESTIC AND INTERNATIONAL USE

Label 228, December 2023

025MC17

9589 0710 5270 0354 1623 21

**PRIORITY MAIL®**

...d for domestic use.

...00 of insurance (restrictions apply).*

...d for domestic and many international destinations.

...stoms declaration form is required.

...For details regarding claims exclusions see the
...com.

...e.usps.com for availability and limitations of coverage.

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

how2recycle.info

PAPER POUCH

**...VELOPE**

**...URED**

EP14F October 2023
OD: 12 1/2 x 9 1/2

POUCH